2010 Ark. App. 71
**Maurice HIGGINS, Appellant**

v.

**Betty HIGGINS, Appellee.**

**No. CA 09–546.**

Court of Appeals of Arkansas.

Jan. 20, 2010.

Frances Morris Finley, Little Rock, for appellant.

Kelly Law Firm, PLC, Little Rock, by: A.J. Kelly, for appellee.

WAYMOND M. BROWN, Judge.

Appellant Maurice Higgins appeals the February 10, 2009 corrected and substituted order of the Pulaski County Circuit Court finding that a constructive trust should be placed on the property located at 14416 West Baseline Road. Appellant argues that appellee lacked standing to bring the lawsuit, that the issue of constructive trust is barred by laches, and that the evidence did not meet the burden of proof of full, clear and convincing evidence as required in a constructive trust involving real property. We find no error and affirm.

Appellee was married to appellant's brother for a number of years. They were divorced by a decree entered on January 14, 1991. Paragraph nine of the decree stated that appellee was given possession of the marital home located on West Bambie Road in Little Rock, Arkansas.[1] Appellee remained in possession of the home and paid Jim Walter Homes [2] every month until the house was paid off. Once the house was paid off, appellant contacted appellee and asked her to send him the payoff letter, which she did. Appellee subsequently sent appellant a quitclaim deed, which was never signed. Controversy arose when appellee's ex-husband placed four out of five acres for sale and the buyer wished to purchase the entire tract, including the house located at 14416 West Baseline Road. Appellant agreed to sell the property, including the house, and appellee filed a complaint in Saline County. The complaint was eventually transferred to Pulaski County. A hearing took place on January 29, 2009, on the issue of constructive trust.

Charlie A. Higgins Jr. testified that he was the brother of appellant and ex-husband of appellee. According to Charlie, he had a trailer next to his grandmother Lela Higgins's five acres of land on West Baseline Road. At some point, he became in-

---

1. The parties agree that this should be West Baseline Road and that this was a scrivener's error.

terested in building a home, and he and appellee went to Jim Walter. According to Charlie, once Jim Walter discovered he had a bankruptcy, he could not get financing. Charlie testified that he called appellant, who agreed to get the deed and the mortgage in his name. Charlie stated that Jim Walter prepared a deed and had him and his grandmother sign it. Charlie testified that he and appellee were able to get the house after appellant had signed for it. According to Charlie, he and appellee picked out a home, and the home was constructed in six weeks by one worker. Charlie stated that the house he purchased was a shell home and only ninety percent of the home was completed by Jim Walter. Charlie testified that he and appellee had the rest of the house fixed or completed, including carpet and linoleum put down, the paneling and inside doors put up, the cabinets built, the well and septic tank put in, the ceiling insulation and spackling applied, the air conditioner and heat put in, the lights fixed, the ceiling fans and fixtures put in, and bricks placed around the foundation. Charlie stated that they also had to tear down an old house located on the property and dispose of it. Charlie testified that they spent at least $15,000 on the house and that his mother put about $12,000 into the house. According to Charlie, appellant did not take part in picking the house and he did not pay for any of the improvements, or anything else, other than having the deed and the mortgage placed in his name. Charlie testified that he and appellee paid the notes on the house until their separation; following the separation, appellee made the payments until the house was paid off. Charlie said that appellant contacted him when he and appellee decided to get divorced and told Charlie that he (appellant) hoped Charlie was not going to put "Betty and them outdoors." Charlie stated that the divorce decree gave the house to appellee and that

he did not have any claim to the house. Charlie testified that the first time appellant saw the house was in 1988, when he went to his aunt's funeral and stayed at the house. Charlie testified that appellant never sent him any document or anything stating that he and appellee were only renting the house.

On cross-examination, Charlie stated that the court in the divorce action did not make him quitclaim his interest in the house to appellee. At that point, appellant moved to have the case dismissed, arguing that appellee did not have any ownership interest in the house and therefore did not have standing to bring the suit. The motion was denied. Charlie testified that he came into ownership of the house because his aunt and grandmother wanted him to have it. Charlie stated that his grandmother did not deed him the house and that he did not have a deed ownership. Charlie said that he signed the deed with his grandmother because he was wondering why his name was not anywhere on the document if he was just getting a co-signer. Charlie acknowledged that the mortgage indicated that the final cost of the house was $89,136. Charlie testified that he paid the taxes on the property all the time and when he asked appellant to help with taxes, he never did. Charlie stated that he paid the taxes on the property to "keep from losing it."

Appellee testified that she had lived in the house at 14416 West Baseline Road for twenty-two years. She stated that she paid Jim Walter every month and that she never paid any rent to appellant. Appellee testified that, although she was not present when Charlie and appellant had a discussion about the house, she knew what was going on. Appellee stated that she went with Charlie to Jim Walter to see about building a home. According to appellee, Charlie had bad credit and needed

a co-signer, so he asked appellant to be a co-signer. Appellant stipulated that appellee had made all the payments on the house. Appellee testified that she paid the property tax every year and submitted receipts into evidence. According to appellee, appellant never helped with the house payments, the insurance payments, or the tax payments. Appellee stated that when she paid the house off, she received a congratulations letter in the mail. Appellee subsequently received a call from appellant asking if the house had been paid off and instructing her to mail the payoff letter to him, which she did. According to appellee, appellant told her that he would sign a quitclaim deed, but never did. Appellee testified that she made a lot of repairs to the house over the years and that she never asked appellant to help pay for any of them. Appellee stated that she never claimed anything about the house on her taxes because her preparer told her that it would not make a difference. According to appellee, appellant was not there during the construction of the house; however, he went there for his aunt's funeral. She stated that she considered the house to be her and Charlie's house.

On cross, appellee stated that she did not move out of the house when she and Charlie were divorced. She testified that she took care of Charlie and appellant's grandmother; however, she denied that there was a deal with appellant that she could live in the house and make the payments and take care of their grandmother. Appellee testified that she did not remember the State taking the land for taxes and that appellant had to redeem the property. Appellee also stated that she did not remember having to repay Jim Walter for taxes they paid on her behalf. At the conclusion of appellee's case, appellant made the following motion:

> For the record, your Honor, I would like to renew my objections to Ms. Higgin's [sic] standing. I'd like to renew my laches argument, and this doesn't fall under a constructive trust. Nobody even owns this property. I'm not sure anyone has a deed to this property. There are so many heirs, and none of these deeds seems to be valid to me. I am asking the Court to dismiss this case.

The court denied the motion.

The deposition testimony of appellant was admitted into evidence. In that testimony, appellant stated that he came to own the lot in question because his grandmother wanted him to have part of a five-acre parcel and deeded it to him. Appellant stated that the deed was signed by his grandmother Lela Higgins and a Charlie Higgins; however, he stated that at the time the deed was signed, his grandfather was dead. According to appellant, the Charlie Higgins who signed the deed in 1985 did not own the property. Appellant testified that his grandmother was ninety-seven or ninety-eight and in failing health when the deed was signed. Appellant stated that Lela wanted him to have the property because he lived in California but would make trips to Arkansas to see about her. Appellant testified that he was preparing to move back to Arkansas to take care of his grandmother and that was why he had the house built. Appellant stated that he did not build the house for appellee and Charlie to live in. Appellant testified that appellee was not involved in the conversation he had with Charlie. According to appellant, he allowed appellee and Charlie to move into the house so that it would not be vacant and because appellee was helping take care of his grandmother.

Appellant testified that he made arrangements with Charlie about the house, and those arrangements were that Charlie and appellee could stay in the house, but

they had to make the payments and keep the taxes paid. He also stated that he told Charlie that he could make whatever improvements he wanted to the house. Appellant testified that Charlie and appellee made the payments but that they paid the taxes every now and then. According to appellant, the property was placed for sale and he had to catch up on the taxes. Appellant stated that Charlie instructed appellee that she had to move out of the house when they separated but that he (appellant) told appellee she could remain in the house until her son reached eighteen. According to appellant, the only thing he required of appellee was to keep up the payments and the taxes. Appellant stated that appellee had spoken to him a few years ago about buying the house from him, and he told her she could if she could find a way to move it off of the land. According to appellant, they never had another conversation about appellee buying the house. Appellant testified that he called Charlie when he found out that there were for-sale signs on the property. Charlie denied knowing anything about it so appellant did some research and found that Charlie had listed four acres for sale, but the agent wanted to sell the whole five acres, including the house. Appellant stated that he told the agent he had no problem with it if it would help his brother. Appellant testified that he found someone to represent him in the sale and that he was subsequently sued by appellee. Appellant stated that his grandmother deeded him the five acres because she wanted him to move back to Arkansas. He also stated that his grandmother did not deed the property to anyone else. Appellant testified that he had served in the military for twenty years and that he made trips to Arkansas "kind of on a regular basis[.]"

On cross-examination, appellant stated that he moved to California permanently in 1955. Appellant testified that he had been stationed in other areas of the United States and even spent time in Vietnam, but he returned to California in 1972 and had been a resident since that time. Appellant stated that before 1985, Charlie lived next door to the five-acre tract in a trailer. Appellant testified that Charlie was not involved with "talking to Jim Walter Homes before construction started." He stated that he went back and forth during the construction of the house and that he did not know, however, if there was a salesman present during construction or how many men were sent out to build the house. According to appellant, the house was "livable" when Jim Walter put it up. Appellant acknowledged that appellee and Charlie made all the payments to Jim Walter but stated that the payments were made in lieu of rent. Appellant testified that he was informed by Jim Walter that the mortgage had been paid off. Appellant stated that he did not make any improvements on the house and that he did not claim the income on his taxes. He acknowledged that he had received a quitclaim deed in the mail but did not know where it came from. Appellant stated that he did not respond to the deed.

On redirect, appellant stated that he made a deal with Charlie that Charlie would pay Jim Walter instead of paying rent. Appellant also stated that Charlie was responsible for the taxes as part of the deal. Appellant testified that the home was prefabricated and was not built on site. According to appellant, the house was brought to the property in sections.

On re-cross, appellant stated that he paid what the law required him to pay— ten dollars to make the deed legal. He insisted that appellee and Charlie paid the mortgage in lieu of rent. According to appellant, appellee and Charlie did not pay taxes more than three times.

The trial court entered a corrected and substituted order on February 10, 2009, finding a constructive trust. In that order, the court found appellee's and Charlie's version of events credible as to why the mortgage was placed in appellant's name. The court found that appellee paid all the taxes on the property except one payment made by appellant during the course of the litigation. The order further stated,

6. The defendant has lived in California since 1972. He had made no plans to move to Arkansas, and the Court does not find his deposition testimony credible that he planned to move to Arkansas and live in the subject property some day.

7. The plaintiff's ex-husband and the defendant were brothers and were in a confidential relationship when the defendant agreed to help his brother and the plaintiff enter into a contract to build a home. The defendant accepted title to the property and signed the mortgage with Jim Walters [sic] Home for the benefit of his brother and the plaintiff.

8. Therefore, the Court finds that the plaintiff has proven by clear, cogent and convincing evidence that a constructive trust should be imposed on the subject property, and the defendant is ordered to convey title to the property to the plaintiff.

This appeal timely followed.

Appellant argues three points of error: (1) appellee lacked standing to bring the suit, (2) constructive trust is barred by laches, and (3) the evidence does not support a finding of a constructive trust.

▪ Arkansas Rule of Civil Procedure 17(a) states, "Every action shall be prosecuted in the name of the real party in interest." It is well settled that "[a] real party in interest is considered to be the person or corporation who can discharge the claim on which the allegation is based, not necessarily the person ultimately entitled to the benefit of any recovery." *Forrest Constr., Inc. v. Milam*, 345 Ark. 1, 11, 43 S.W.3d 140, 147 (2001). In the instant case, appellee is the real party in interest. The 1991 divorce decree granted appellee possession of the marital home located on West Baseline Road. Additionally, Charlie testified that he held no claim to the property and considered it appellee's. Therefore, for purposes of this lawsuit, appellee was the real party in interest and as such, she had standing to bring suit against appellant.

▪ Next appellant argues that the issue of constructive trust is barred by laches. The doctrine of laches is based on a number of equitable principles that are premised on some detrimental change in position made in reliance on the action or inaction of the other party. *Jaramillo v. Adams*, 100 Ark. App. 335, 268 S.W.3d 351 (2007). Laches or estoppel does not arise merely by delay, but by delay that works a disadvantage to the other. *Id.* So long as the parties are in the same position, it matters little whether one presses a right promptly or slowly. *Id.* In the instant case, the trial court's final judgment and order made no reference to appellant's defense of laches. This court will not consider laches on appeal when the matter was not brought to the attention of the trial court for a ruling. *Britton v. Floyd*, 293 Ark. 397, 738 S.W.2d 408 (1987). The burden to obtain a ruling is with the movant, and issues left unresolved may not be relied upon on appeal as they are waived. *Id.*

Finally, appellant argues that there was no evidence to support a finding of a constructive trust. According to appellant, he and appellee did not share a confidential relationship. However, it must be noted that the trial court did not find that appel-

lee and appellant shared a confidential relationship. The order stated that the confidential relationship was shared between appellant and his brother, Charlie, appellee's ex-husband.

 A constructive trust is an implied trust that arises by operation of law when equity demands. *Tripp v. Miller,* 82 Ark. App. 236, 105 S.W.3d 804 (2003). These trusts are imposed against a person who secures legal title by violating a confidential relationship or fiduciary duty, or who intentionally makes a false oral promise to hold legal title for a specific purpose and, after having acquired the title, claims the property for himself. *Wrightsell v. Johnson,* 77 Ark. App. 79, 72 S.W.3d 114 (2002). The basis of a constructive trust is the unjust enrichment that would result if the person having the property were permitted to retain it. *Tripp, supra.* To impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts, and the burden is especially great when title to real estate is sought to be overturned by parol evidence. *Nichols v. Wray,* 325 Ark. 326, 925 S.W.2d 785 (1996).

 Although we review traditional equity cases de novo, the test on review is not whether we are convinced that there is clear and convincing evidence to support the trial court's findings but whether we can say that the trial court's findings are clearly erroneous. *Statler v. Painter,* 84 Ark. App. 114, 133 S.W.3d 425 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake was made. *A.R. v. Brown,* 103 Ark. App. 1, 285 S.W.3d 716 (2008).

 The trial court found appellee's and Charlie's testimony credible that appellant received the deed and had the mortgage placed in his name because Charlie's credit was bad due to a prior bankruptcy. Appellee and Charlie made all payments on the mortgage, paid for all improvements, paid the insurance, and paid the property tax. The only thing appellant did was accept title to the land and put the mortgage in his name. Once the mortgage was paid off, appellee presented appellant with a quitclaim deed for the property, with which appellant did nothing. Subsequent to appellant's inaction, appellee filed a claim against appellant and ultimately received judgment in her favor. Based on our standard of review, we cannot say that the trial court was clearly erroneous. Therefore, we affirm.

Affirmed.

VAUGHT, C.J., and GLOVER, J., agree.