2010 Ark. App. 500

**Terry DRUYVESTEIN, Appellant**

v.

**SUMMIT BROKERAGE SERVICES, INC. and Lois Druyvestein, Appellees.**

**No. CA 09–921.**

Court of Appeals of Arkansas.

June 16, 2010.

Troy Gaston, Walters & Gaston, Attorney at Law, Greenwood, for appellant.

Roy R. Gean, Jr., Gean, Gean & Gean, for appellee.

COURTNEY HUDSON HENRY, Judge.

Appellant Terry Druyvestein appeals the order entered by the Circuit Court of Sebastian County dismissing his complaint that sought the creation of a constructive trust. For reversal, appellant contends that the circuit court's decision is clearly erroneous. We find merit in this argument and reverse and remand.

The record reflects that H.J. "Humpy" Druyvestein died on February 24, 2007, survived by his wife, appellee Lois Druyvestein. Appellant is the son of Humpy's deceased brother. During his life, Humpy held two bond accounts at Morgan Stanley that were managed by his broker, Donna Young. One account was payable at Humpy's death to appellant, while the other was payable upon his death to the daughter of his second wife, Sue Rose, and her son, John Rose. In early January 2004, Young left Morgan Stanley and moved to a firm called Delta Financial, where she operated as a broker for appellee Summit Brokerage Services, Inc. (Summit). Humpy transferred the two bond accounts from Morgan Stanley to Delta Financial on January 28, 2004. In so doing, Humpy executed a registration application for an account ending in the number 8136, designating appellant as the beneficiary of the account upon Humpy's death. Humpy completed a similar document for an account ending in the number 8134, naming Lois as the death beneficiary of that account.

In July 2004, Humpy executed a registration application that changed the transfer-on-death designation of the 8136 account to Lois. However, until months after Humpy's death, the 8136 account remained entitled "H.J. Druyvestein TOD Terry Druyvestein." According to Young, even though her signature appeared on the document changing the beneficiary of the 8136 account to Lois, she was oblivious to the alteration, and, when Humpy died, she advised both Lois and appellant to wait until October 2007 to liquidate the accounts in order to receive full par value. Lois did not accept that advice and cashed in the 8134 account in April 2007. Appellant intended to heed Young's advice, and Young established an account for him to receive the funds in October. However, Summit dishonored the request to transfer the funds in the 8136 account to appellant after discovering the July 2004 registration application that named Lois as the transfer-on-death beneficiary. On August 28, 2007, Michael Hill, an executive vice president and the chief compliance officer at Summit, wrote Lois a letter stating that the 8136 account should have been changed to reflect her name as the transfer-on-death beneficiary as of July 2004 and that steps were being taken to accomplish that correction.

On October 24, 2007, appellant filed suit against Summit and Lois seeking to establish a constructive trust in the 8136 account. As a result of the litigation, Summit froze the account. Later, the parties proposed and the circuit court entered an agreed order dismissing Summit from the lawsuit with prejudice. The case pro-

ceeded to trial against Lois, who was unable to attend due to poor health.

In his testimony, appellant stated that his father and Humpy worked together and were close brothers. He said that he now lived in Montana and that he arranged a family reunion in 2002 where he met Lois, Humpy's new wife. Appellant said that Humpy called him in 2003 and said that he had a bond that he wanted to leave him when he died. He testified that they briefly discussed the bond again in July 2004 at another family reunion and that Humpy said nothing to him about removing his name from the bond. Appellant said that he visited Humpy and Lois in 2006 and that Humpy spoke of the bond and also about leaving him a chair that had belonged to his grandfather. He testified that, when Humpy left the room, Lois told him that he could thank her for putting the bond in his name.

Appellant testified that he spoke to Lois after Humpy's funeral and that she asked him if he had cashed the bond. He said that Lois advised him to get the money before John Rose did. Appellant stated that he decided to wait until October 2007 to cash the bond in order to receive full value. He said that he learned that there was a problem in September 2007 when he received a letter stating that Lois's name was on the final TOD form. Appellant testified that he telephoned Lois and spoke to her daughter, Linda Van Divner, because Lois was in the hospital. He said that Linda told him that Summit must have made a mistake. Appellant called Linda a few weeks later, and she referred him to Lois's attorney.

Appellant testified that Humpy's intentions were clear and that he must have signed the July 2004 TOD form by mistake. He said that Humpy could not have realized that his name had been removed from the account because he had talked to Humpy many times since the change occurred.

Loretta Druyvestein, appellant's wife, testified that she was a witness to the conversation between Humpy and appellant about the bond at the reunion in July 2004. She said that Lois did not contradict Humpy's statements that he wanted appellant to have the bond. Loretta testified that she spoke with Linda after the mistake was discovered and that Linda acknowledged that the bond was supposed to go to appellant. She also recalled the visit in 2006 when Humpy spoke about the bond at the kitchen table.

Young testified that she had serviced Humpy's accounts since 1998 and that from 2004 to 2007 she met with Humpy and Lois at least four times a year. She said that Lois was present when the accounts were transferred in January 2004 when Humpy made his wishes known that he wanted to keep appellant as the death beneficiary on the one account and that he wanted Lois to be the death beneficiary on the other account, instead of Sue and John Rose. Young testified that Humpy never indicated that he wanted appellant removed as the death beneficiary and that it was always her understanding, Humpy's understanding, and Lois's understanding that appellant was to receive the 8136 account at Humpy's death. She said that Humpy received separate monthly statements on both accounts and that one would have been titled "H.J. Druyvestein TOD Terry Druyvestein," while the other would have read "H.J. Druyvestein TOD Lois Druyvestein." Young stated that the designations would have been obvious to anyone who would have viewed the envelope. She testified that, in the many meetings she had with Humpy and Lois after July 2004, Lois never questioned why appellant's name still appeared on the account. Young stated that, when Lois contacted

her about Humpy's death, Lois did not inquire about the 8136 account and that Lois never asked why she was not receiving the monthly statements regarding the 8136 account following Humpy's death.

Young further testified that Humpy did not ask her to change the death beneficiary on the account in July 2004. She said that she had no doubt whatsoever that Humpy never wanted to remove appellant from the 8136 account. Young said that, if Humpy had asked her to change the beneficiary to Lois, she would have simply moved the assets from the 8136 account to Lois's 8134 account rather than have Humpy execute a change in beneficiary form. Young asserted that the execution of the form was a mistake. She said that, had the title of the account been changed as it should have been when the form was completed, then both she and Humpy would have been alerted about the mistake and that it could have been corrected. She had no recollection as to why the change in beneficiary form was executed. Her best explanation was that it was a housekeeping matter requested by the home office. She explained that, when the accounts were moved from Morgan Stanley to Delta Financial, the 8134 account should have been registered the same way as it was previously titled in the names of Sue and John Rose and then changed to designate Lois as the beneficiary. Young thought that the change in beneficiary form was perhaps executed to correct that oversight. She also surmised that she may have written the wrong account number on the form.

John Rose testified that Humpy conveyed most of his property, including Humpy's home, to him and his mother and that he managed other properties for Humpy. He said that Humpy told him that he intended for appellant to have the bond when he died. Rose stated that

Humpy left Lois two duplexes in addition to the one bond account. Karen Spring, Humpy's niece and appellant's sister, testified that Lois called her in the summer of 2007 with complaints about John Rose. Spring said that Lois acknowledged that appellant was to receive the bond and that Lois assumed that he would share it with his siblings.

Michael Hill testified by deposition that he reviews all transfers in excess of $100,000 and that the discrepancy between the 8136 account title and the July 2004 change in beneficiary was discovered when appellant made the request to transfer the assets in the account. He said that, based on the July 2004 document, Summit recognized Lois as the beneficiary of the 8136 account. Hill testified that Lois did not claim the 8136 account because he did not think that she knew that she was the beneficiary of another account. He stated that, when he spoke with Young, she seemed surprised about the change in beneficiary and that she said that the beneficiary should have been appellant. The final witness, Linda Van Divner, testified that Humpy never said anything to her about the bond. She denied ever speaking to Loretta.

The circuit court took the case under advisement and later issued a letter opinion outlining the testimony and evidence and setting forth its decision. In its ruling, the court stated that Young confessed to making an egregious mistake but found that her testimony was confusing because she could not specifically recall what occurred on the day that Humpy changed the death beneficiary from appellant to Lois. The circuit court also noted that, after the change was made, Humpy met with Young at least four times a year but that no further changes were made to the account. Citing as analogous the decision in *Trimble v. Trimble*, 181 Ark. 350, 25

S.W.2d 758 (1930), the circuit court determined that, based on the evidence, it could find no clear and convincing evidence of a mistake. Therefore, the court denied appellant's request to establish a constructive trust.

■ Appellant argues on appeal that the evidence supported a finding that the change in beneficiary form was executed by mistake and that the circuit court's refusal to impose a constructive trust is clearly erroneous. A constructive trust is an implied trust that arises by operation of law when equity demands. *Waterall v. Waterall*, 85 Ark. App. 363, 155 S.W.3d 30 (2004). It is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. *Tripp v. Miller*, 82 Ark. App. 236, 105 S.W.3d 804 (2003). The duty to convey the property may arise because it was conveyed through fraud, duress, undue influence or mistake, breach of fiduciary duty, or wrongful disposition of another's property. *Id.* To impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt as to the necessary facts. *Higgins v. Higgins*, 2010 Ark. App. 71, 374 S.W.3d 56.

Although we review traditional equity cases de novo, the test on review is not whether we are convinced that there is clear and convincing evidence to support the circuit court's findings but whether we can say that the circuit court's findings are clearly erroneous. *Statler v. Painter*, 84 Ark. App. 114, 133 S.W.3d 425 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake was made. *McCracken v. McCracken*, 2009 Ark. App. 758, 358 S.W.3d 474.

We are left with a definite and firm conviction that the circuit court was mistaken in its decision. All witnesses who professed knowledge of Humpy's wishes testified that Humpy intended to leave the account to appellant. If that were the sum total of the evidence, we could have no quarrel with the circuit court's decision, as the court was entitled to make its own assessment of the witnesses' credibility. However, the testimony was strongly corroborated by objective facts that compel a conclusion that the change in beneficiary form was executed by mistake. It is undisputed that, after the document was executed in July 2004, the account title continued to reflect that appellant was the designated beneficiary of the account upon Humpy's death. It is also without dispute that Humpy received monthly statements showing appellant as the beneficiary of the account. Humpy, apparently a seasoned businessman, met quarterly with Young, and at no time did he register a complaint about appellant remaining as the death beneficiary in the two years and seven months preceding his death. We are also mindful that Lois attended the quarterly meetings with Young and that Lois did not lay claim to the account following Humpy's death. Although Young was at a loss to explain what happened, her testimony was unequivocal that she made a mistake and that Humpy did not ask her to remove appellant as the beneficiary of the account. Based on the record as a whole, we hold that the circuit court's ruling is clearly erroneous.

Also, we have studied the case the circuit court relied upon and conclude that it is not particularly germane to the issue presented in this appeal. In *Trimble, supra*, Trimble spoke often about changing the beneficiary of his life insurance policy. However, he never took the steps neces-

sary to accomplish that goal, and the supreme court affirmed the chancellor's refusal to grant reformation. Here, the owner of the account did execute a form changing the beneficiary designation of an account, and the question is whether the owner intended to do so or whether it was accomplished by mistake. Thus, the issues in the two cases are quite different. Consequently, *Trimble* is not persuasive authority.

Reversed and remanded.

ROBBINS and GRUBER, JJ., agree.